**MID–WOOD, INC., et al., Plaintiffs,**

v.

**HUNTER AGRI–SALES, INC., et al., Defendants.**

No. 3:00CV7069.

United States District Court, N.D. Ohio, Western Division.

Jan. 3, 2002.

Andrew J. Dorman, Steven G. Janik, Janik & Dorman, Eileen M. Joyce, Baughman & Associates, William J. Muniak, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, for Plaintiffs.

George E. Petersmarck, Jr., Petersmarck Callahan Bauer & Barbour, Mt. Clemens, MI, Margaret G. Beck, Martin J. Witherell, Fuller & Henry, James R. Jeffery, Susan B. Nelson, Spengler Nathanson, Clare K. Smith, David G. Schlaudecker, Thomas W. Palmer, Sr., Marshall & Melhorn, Toledo, OH, for Defendants.

## ORDER

CARR, District Judge.

This case arises from the loss through leakage of approximately 100,000 gallons of liquid fertilizer from a storage facility purchased by the plaintiff Mid–Wood from defendant Hunter Agri–Sales. Pending is Hunter's motion for summary judgment. For the reasons that follow, the motion shall be granted.

Hunter sold the storage facility under the name "Plia–Tank" to Mid–Wood in 1988. The exterior appearance of the facility resembles a low, rectangular roofed

shed, 124' feet long and 40' wide, with its sides supported by earthen embankments to support the facility when it contains fertilizer. The shed covers an excavated pit, into which is inserted a "primary liner." The primary liner keeps the fertilizer from leaking. (*See* Doc. 74, Exh. H, attachments a, b).

Hunter offers two types of backup, or secondary protections against leaks. The less expensive version, which Hunter installed at Mid–Wood, is a "tile monitor." This consists of a six inch layer of sand underneath the primary liner, with a system of perforated pipes to collect leaks and drain any leakage to a sump. Underneath the sand layer, there is another liner, which was 6 mils thick and the pieces of which were overlapping.

The more expensive version of a secondary protection system would have had, in place of the secondary layer composed of overlapping sheets, a completely fabricated 20 mil liner (i.e., a thicker liner with sealed seams). This would have enabled the secondary protection system to be more capable of containing leakage from the primary liner.[1] Both versions included the system of perforated pipes and sump.

If fertilizer were observed in the sump, the operator would know that the primary liner was leaking. In which case, it could take steps to empty the facility and find and repair the leak.

In 1995, the Ohio Department of Agriculture (ODA) instructed Mid–Wood to monitor the inventory level in its storage facilities, including the Pila–Tank at issue in this case, on a daily basis. Instead, monitoring occurred only on a monthly basis.

An ODA inspector, Terry Lammers, testified that he inspected the Mid–Wood facility on March 10, 1998. According to Lammers' testimony, Phil Bowsher, Mid–Wood's plant manager, either knew or told Lammers that there was a leak in the Pila–Tank. (Doc. 69, Exh. 7, at 23).[2]

Mr. Lammers' ODA supervisor, Richard Beidelschies, confirmed through a conversation with Bowsher and another Mid–Wood employee, Richard Strow, that Mid–Wood was aware of a leak in the primary liner.

Sometime between April 15 and April 21, 1998, as noted in the report of plaintiffs' expert, the fertilizer level in the Pita–Tank dropped from 66″ to 37.5″, indicating that about 100,000 gallons of fertilizer had leaked from the facility. (Doc. 74 Exh. B, at 3).

The plaintiff's complaint alleges several causes of action against Hunter: 1) breach of contract, through provision of inadequate materials and equipment to meet contract specifications; 2) breach of express warranties; 3) negligent design and construction; 4) the system was unreasonably dangerous and defective for its foreseeable and intended use, and related failure to warn; 5) fraudulent concealment of defects in and installation of the facility; 6) fraudulent misrepresentation as to the qualities and characteristics of the facility; 7) constructive fraud in representations to Mid–Wood; 8) negligent misrepresentation; 9) nuisance; and 10) trespass.

1. The parties disagree as to whether the more expensive secondary protection system was offered to Mid–Wood. For purposes of this decision, I assume that Mid–Wood was not offered this option.

2. Although Bowsher testified that he never saw fertilizer in the sump (Doc. 69, Exh. 4, at 35), his deposition does not dispute Lammers' testimony that Bowsher either knew or told Lammers on March 10, 1998, that there was a leak in the tank. The same is true with regard to Beidelschies' testimony that Bowsher confirmed to him that Mid–Wood was aware of a leak.

The parties disagree on what the contract sold. This disagreement can be resolved be examining the contract.

■ By its own terms, the contract stated that Hunter was selling support posts, interior and exterior plywood, liner plating, "6 mil poly under lining with tile monitor system," and the primary liner. Nothing in the contract stated that Hunter was providing as, alleged in the complaint, a "secondary liner and the pipe and sand drainage system [that were] designed to: (1) contain the leak and (2) detect the leak." (Compl., ¶ 12).

Plaintiffs assume that Hunter sold a system that would contain, rather than detect, and for a period of time, divert leakage from the primary liner. That is not, however, what the contract stated. The contract simply stated that Hunter would provide "6 mil poly under lining with tile monitor system."

There can be no doubt that that underlining was incapable of containing leakage of the size experienced by Mid–Wood in April, 1998, particularly in view of the fact that the lining was installed in an overlapping manner, rather than with sealed seams. Even if Hunter did not inform Mid–Wood about the option of purchasing the 20 mil, completely fabricated liner, which presumably could, or should have withstood a leak of the size giving rise to this suit, that fact does not affect the description of what Mid–Wood purchased.

Thus, with regard to the claim that Hunter breached its contract, plaintiffs cannot prevail. They do not dispute that Mid–Wood got what it paid for: a 6 mil poly under liner with tile monitoring system. That that liner, as installed, did not do what Mid–Wood now claims it should have done is immaterial: what matters is whether the item described in the contract was delivered and installed. There is no doubt that it was.

Plaintiffs' second claim is that Hunter breached express warranties. These warranties, according to Mid–Wood, are found in advertising materials received from Hunter prior to the sale. (Doc. 74, Exh. H, attachments a, b). Included in those materials are statements that the system has wood walls that won't crack or rust, and were "designed to last in most soils 30 years or more" and the "Hunter Monitoring System—if tank fails, we have tested underlining system to catch spill." These statements, according to plaintiffs, constitute express warranties that were breached.

Plaintiffs' warranty claim disregards the contract's express disclaimer of all warranties, except those specifically recited in the contract, including implied warranties of merchantability and fitness for particular purposes. In any event, plaintiffs have not responded to defendant's arguments as to this claim.

■ Plaintiffs' principal contention, as expressed by their opposition to the defendants' motion, is that the "secondary containment system" was improperly designed and constructed, so that Hunter is liable for negligence, design defects, and product liability. However, as previously noted, plaintiffs' reference to a "secondary containment system" misconstrues what Mid–Wood purchased. It was neither promised nor received a "secondary containment" system; instead, it was promised and received a "6 mil poly underlining with tile monitoring system."

In light of the fact that Mid–Wood neither ordered nor received a containment system, the conclusory opinion of plaintiffs' expert, based on his assumption that the contract called for a containment system, that such "system appears to be inadequate, [and] did not function as intended" is unfounded and irrelevant. In making that statement, the expert is merely as-

serting that one of the components provided under the contract did not perform a function that it was not intended to perform, and that it was not represented as being able to perform.

In his deposition, the expert acknowledged his awareness of the contract's terms:

Q. And Mid–Wood didn't buy a secondary liner with sealed seams, correct?

A. I have no idea—oh, that's correct.

Q. It's not contained in the purchase order, is it?

A. No, it's not.

\* \* \* \* \* \*

Q. Do you see anywhere in the purchase order where it talks about a secondary containment system?

A. ... No this document does not say anything about that.

(Doc. 69, Exh. 10 at 70–71).

Without sealed seams, the expert acknowledged, if a sufficient volume of fertilizer leaked from the primary liner, the secondary system, as provided by Hunter, could not contain the leakage:

Q. [A]t some point if a sufficient volume of product escaped it would overwhelm the capacity of that secondary liner?

A. In this particular application where you didn't have sealed seams on the secondary liner, yes.

(*Id.* at 69–70).

Thus, when asked whether the system that was provided had functioned as intended, the expert agreed that it had:

Q. [W]ould you agree that the tile monitor system operated the way it was intended, i.e., they got product [i.e., leaked fertilizer] to the sump and we saw there's product in the sump, correct?

A. Yes.

Q. And at that point we know, at least as of March 10, that we've got a leak?

A. Yes.

(*Id.* at 64).

Earlier, plaintiffs' expert had been asked:

Q. In this system if there was fertilizer entering the sumps, is that an indication that the primary liner is leaking?

A. Yes.

Q. And at that point is it advisable to continue to use the primary liner?

A. No.

Q. What would be an appropriate response at this point?

A. Empty the tank and figure out where the leak is.

(*Id.* at 23).

Thus, when the expert's testimony is viewed in light of the parties' actual contract, rather than the contract that plaintiffs contend erroneously that the parties entered into, he agrees that there is no merit to plaintiffs' claims of negligence, defective design, and product liability.

 To the extent that plaintiffs contend that Mid–Wood was inadequately warned about the risks that could arise during use of the storage facility, there is no support for their contention. First, as noted, there was nothing defective in the design or installation of what they bought and received under the contract. Moreover, as Hunter points out, it warned Mid–Wood shortly after the project had been completed that it had to keep some amount of fertilizer in the tank at all times due to the high water table of the ground in which the tank was installed. That warning was not heeded, as the tank was drained annually, and then refilled prior to each planting season. This created a risk that the primary liner would become weakened and leak.

Plaintiffs have not shown that any other warnings were required under the circum-

stances. Hunter is entitled to summary judgment on the claim of insufficient warning.

■ Finally, Hunter is likewise entitled to summary judgment on the various permutations of plaintiffs' claim that it engaged in fraudulent or otherwise deceptive practices in inducing Mid–Wood to purchase the Pila–Tank. The only arguably inaccurate statement attributed to Hunter is found one line of its advertising flyer— "Hunter Monitoring System—if tank fails, we have tested underlining system to catch spill." [3]

That statement is, so far as this record shows, true: Hunter had its 20 mil completely fabricated secondary liner, and plaintiff has not shown that that alternative would not have been able to "catch spill"—even a "spill" as massive as the 100,000 gallons from Mid–Wood's facility. The fact that the system sold to Mid–Wood was unable to contain the leak from its primary liner does not make that single statement false.

In any event, that description is at least arguably accurate with regard to the system purchased by Mid–Wood. As of March 10, 1998, nearly six weeks before the massive leak was discovered, the system had shown that it could "catch spill" and divert leakage to the sump, where it could be observed.

I conclude, accordingly, that there is no merit to plaintiffs' fraud and related claims. The defendant is entitled to summary judgment as to those claims.

The parties have not briefed defendant's conclusory demand for summary judgment as to the nuisance and trespass claims. Cursory consideration of applicable Ohio law establishes that those claims are without merit.

■ The nuisance claim alleges that Hunter's "unsolicited, unauthorized, unwelcome, and careless conduct in causing, permitting, and/or contributing to cause" the spill of 100,000 gallons of fertilizer "constitutes an absolute nuisance." (Compl. ¶ 48). Concerning absolute nuisance, the Ohio Supreme Court has stated:

An absolute nuisance, or nuisance per se, consists of either a culpable and intentional act resulting in harm, or an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault.

*Metzger v. Pennsylvania, Ohio & Detroit R.R. Co.*, 146 Ohio St. 406, 66 N.E.2d 203 (1946) (Syllabus, ¶ 1).

The three categories of conduct that can give rise to liability for actual nuisance were described in *Uland v. S.E. Johnson Companies*, 1998 WL 123086, *4 (Ohio App. 6th Dist., Mar. 13, 1998) (citations omitted):

An example of the first category (intentional act resulting in harm) is polluting of a stream without lawful authority by casting sewage therein. The harm resulting from the culpable act is substantially certain to occur. An example of the second category (unlawful conduct causing unintentional harm) is the violation of a safety statute; the violation of a specific legal requirement established for the protection of others imposes absolute liability (i.e., negligence per se or negligence as a matter of law) regardless of the degree of care used. An example of the third category is the lawful undertaking of an ultrahazardous activity. These lawful activities are so dangerous that they are permitted only

---

**3.** Plaintiffs claim that Hunter represented that its system would last for thirty years. That reference, however, was to the wood used to construct the shed that covered the container.

when the actor insures the public against the harmful propensities of them.

None of the conduct attributed to Hunter comes within any of these categories. It is, accordingly, entitled to summary judgment as to plaintiffs' nuisance claim.

■ The court in *Uland* also defined the elements of a cause of action for trespass: "1) an unauthorized intentional act, and 2) an intrusion that interferes with the owner's right of exclusive possession of her property." There has been no allegation or suggestion of intentional conduct on Hunter's part that led to the discharge of 100,000 gallons of fertilizer from Mid-Wood's Pila–Tank. Hunter is, accordingly, entitled to summary judgment as to plaintiffs' claim for trespass.

### Conclusion

In light of the foregoing, it is

ORDERED THAT defendant's motion for summary judgment be, and the same hereby is granted.

So ordered.